# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2016

## STATE OF TENNESSEE v. DELARRIS JONES
### a/k/a CEDRICK JONES

**Appeal from the Criminal Court for Shelby County**
**No. 13-04830    James M. Lammey, Jr., Judge**

_____

**No.  W2015-01085-CCA-R3-CD  -  Filed June 6, 2016**

_____

The Defendant, Delarris Jones, also known as Cedrick Jones, was convicted by a Shelby County Criminal Court jury of attempt to commit second degree murder, a Class B felony; aggravated assault, a Class C felony; employing a firearm during commission of a dangerous felony, a Class C felony; possessing a firearm as a person convicted of a felony involving the use of violence, a Class C felony; and possessing a firearm as a person convicted of a felony drug offense, a Class D felony.  *See* T.C.A. §§ 39-13-210(a)(1) (2014) (second degree murder); 39-13-102(a)(1)(iii) (Supp. 2011) (amended 2013, 2015) (aggravated assault); 39-17-1324 (2014) (employing a firearm during the commission of a dangerous felony); 39-17-1307(b)(1)(A), (B) (Supp. 2012) (amended 2014) (felon in possession of a firearm); 39-12-101(a) (2014) (criminal attempt).  The Defendant received an effective forty-year sentence.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J. joined.

Monica A. Timmerman (on appeal), Memphis, Tennessee; Stephen C. Bush, District Public Defender; Sam Christian and Kathy Kent (at trial), Assistant Public Defenders, for the appellant, Delarris Jones.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case arises from a May 5, 2013 incident in which Tyion Taylor was shot while inside his home. At the trial, the victim testified that the Defendant was his former coworker and that he considered the Defendant a friend. The victim said that the Defendant had visited the victim's home on previous occasions and that they did not have any disagreements. The victim stated that on May 5, 2013, the victim missed a telephone call from the Defendant, that the victim returned the Defendant's call, and that the Defendant asked to come to the victim's home. The victim said that he and the Defendant communicated periodically and that the victim anticipated a normal, friendly visit.

The victim testified that the Defendant arrived at his home, that they stood in the kitchen and talked for ten or fifteen minutes, and that they did not drink alcohol or use drugs. The victim said that although he smoked marijuana, he had not smoked it that day. The victim stated that when he turned away from the Defendant and then turned back, the Defendant had a small gray handgun pointed at him. The victim said he raised his hands and said, "Man, whatever it is it's not worth it." The victim said that the Defendant told him, "Don't do it, Bro," and that the victim was afraid.

The victim testified that the Defendant attempted to force the victim into the bathroom, that the victim backed up toward the bathroom, and that the victim decided he would not go into the bathroom because he did not know what the Defendant would do to him. The victim said that he attempted to run into the bedroom, that the Defendant said, "I said bathroom," and that the victim heard a gunshot and felt a burning pain. The victim stated that he fell on the floor, that he felt burning and wetness, that he saw blood coming from his arm and on his shirt, and that when he turned over, he saw blood flowing from his back. The victim had been shot through the arm and the bullet entered his torso.

The victim testified he was not armed and denied "pull[ing] a gun on" the Defendant. The victim denied the Defendant came to the victim's home to buy or sell marijuana. The victim said that the marijuana present in the police photographs belonged to him and that he was rolling marijuana cigarettes before the incident.

The victim testified that he was discharged from the hospital the same day as the shooting, that his arm ached periodically, and that he had residual elbow pain. The victim said that he identified the Defendant in a photograph lineup.

Photographs of the interior of the victim's home and the photograph lineup were received as exhibits. The photograph lineup showed the victim's signature, the date, and "This [is] Cedrick, he shot me," written by the victim.

On cross-examination, the victim testified that he met the Defendant between 2007 and 2010, that he and the Defendant were coworkers for about two weeks, and that after the victim changed jobs, he and the Defendant remained friendly. The victim said that he had visited the Defendant's home previously but had not met the Defendant's family. The victim said that on the day of the shooting, the Defendant called the victim and asked him where he was and for his address. The victim stated that he and the Defendant had not spoken on the telephone the day before the shooting and that the Defendant had visited him previously.

The victim testified that when the Defendant arrived, the victim met him outside and "flagged him down" because the Defendant had passed the victim's home. The victim said he and the Defendant walked inside together. The victim said that he and the Defendant did not have a history of animosity and that they did not argue on the day of the shooting. When asked whether the victim told the police that the Defendant tried to rob him, the victim said he assumed the Defendant was trying to rob him because they did not have any problems. The victim said that the Defendant's statement, "Don't make me do it," was a sign the Defendant intended to rob him. The victim stated that he did not have anything valuable in the home. The victim said that he and the Defendant discussed the victim's moving into a new home and that the Defendant said the victim looked like he was "doing better" since the last time they met.

The victim testified that the Defendant paced between the back door and the kitchen table where the victim stood and that the Defendant asked the victim whether he was alone. The victim said that marijuana, rolling papers, his wallet, and his cell phone were on the kitchen table. The victim said that he did not see the Defendant's gun when the Defendant entered the home, that the victim first saw the gun in the Defendant's hand when the victim turned around, and that the gun was only fired when he tried to run away. The victim denied that he had a gun on the kitchen table and said he had not seen the gun previously. The victim did not remember whether the Defendant wore a jacket or removed the gun from his jacket.

The victim testified that the Defendant was between three and six feet in front of him when the Defendant drew the gun. The victim acknowledged telling a police officer that nothing had been taken. The victim said that the day after the shooting, he told another police officer the only thing the Defendant could have taken was the marijuana. The victim noted, though, that the marijuana remained on the table and the kitchen floor after the shooting. The victim acknowledged his statement to police that the Defendant "took a little marijuana" and shot the victim in order to rob him. The victim said that at the time he spoke to the police, he did not know whether the Defendant took the marijuana. The victim did not remember testifying at the preliminary hearing that the Defendant did not say anything to him. The victim said that the Defendant did not take his wallet and that the victim had picked up his wallet from the table and placed it in his pocket before the shooting.

-3-

The victim testified that he did not know how the marijuana fell on the kitchen floor because the victim was not in the kitchen when he was shot. The victim did not remember testifying at the preliminary hearing that the Defendant "must have thought I was coming at him." The victim read from his testimony that the Defendant never asked him for anything while pointing the gun at him and that the Defendant told the victim to go into the bathroom. The victim did not remember testifying that the Defendant thought the victim was "fixing to try him." The victim said that he was facing the Defendant when he attempted to run into the bedroom and that the victim heard only one gunshot. The victim said that he did not know how the plate shattered on the kitchen floor and that the plate was on the table before the shooting.

The victim testified that after he was shot, he attempted to call 9-1-1, that his cell phone did not work, that he panicked and went outside to take himself to the hospital, that the bleeding had "kind of" stopped, that he called his girlfriend, and that she took him to the hospital. The victim read from his previous testimony, which he did not recall, that he called the police, that he was concerned the police would call an ambulance for which the victim could not pay, that the victim did not have medical insurance, and that he called his girlfriend and told her he had been shot and needed a doctor.

On redirect examination, the victim testified that about a minute passed from the time the Defendant pulled out the gun and the victim ran into the bedroom. The victim said that during this time, he told the Defendant, "Whatever it is, it ain't worth it[,]" and that he did not know what the Defendant was going to do. The victim stated that he went into his bathroom after the shooting, that he did not see the Defendant leave the home, and that the victim did not threaten the Defendant.

Memphis Police Officer Adam Pickering testified that on May 5, 2013, he processed the crime scene and collected "a projectile" from the hospital. A fired bullet recovered from the victim and a cartridge casing were received as exhibits. Officer Pickering stated that testing revealed the green leafy substance he collected to be 2.62 grams of marijuana.

On cross-examination, Officer Pickering testified that the officers searched the kitchen and hallway and did a cursory examination of the remainder of the home, but that he did not see anything which prompted him to search the remainder of the home. He did not find a weapon.

The parties stipulated that the Defendant was convicted of a felony involving the use of violence in 2011 and of a felony drug offense in 2008.

Memphis Police Officer Jeffery D. Arthur testified that on May 5, 2013, he went to the Defendant's mother's home looking for the Defendant. The Defendant's mother

signed a consent to search form. Officer Arthur discovered the Defendant hiding inside the attic. Officer Arthur stated that he did not recover a weapon from the Defendant.

Upon this evidence, the Defendant was convicted of attempt to commit second degree murder, aggravated assault, employing a firearm during commission of a dangerous felony, and two counts of possessing a firearm as a convicted felon. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. As a preliminary matter, we note that appellate counsel stated the issue presented as "[w]hether the evidence is sufficient to sustain convictions on all charges against the defendant as charged in count one in the indictment[.]" Although counsel appears to restrict the scope of review to Count 1, attempt to commit second degree murder, she begins her argument as though she were contesting the sufficiency of all counts: "In Defendant's case, particularly in regard to the offense of Criminal Attempt Second Degree Murder, the evidence was insufficient to support a finding a [sic] guilt." Furthermore, counsel's sole argument analyzes the sufficiency of the evidence relative to Count 1 without citation to the record and without referencing the Defendant's remaining convictions. *See* T.R.A.P. 27(a)(7); *see also* Tenn. Ct. Crim. App. R. 10(b). Counsel's argument in its entirety is as follows:

> No evidence was presented at the trial that could lead a jury to believe that Defendant intended to kill the victim or was attempting to kill the victim. Additionally, Defendant willingly left the victim after shooting him only once — a shot that was not fatal. Defendant had ample opportunity to kill the victim if that was his intention, but chose not to. Without evidence of Defendant's mental state, the evidence is insufficient to support a finding of guilt by the jury.[1]

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

---

[1] We note that the Defendant does not raise any issue regarding merger or double jeopardy relative to his convictions. We decline, in our discretion, to address these issues on the basis of plain error.

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

# I

## Attempt to Commit Second Degree Murder

The Defendant contends that the evidence is insufficient to support his conviction for attempt to commit second degree murder, arguing that no proof of the Defendant's intent to kill the victim was presented because the Defendant left after firing a single shot. A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Second degree murder is defined as a knowing killing of another. *Id.* § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2011) (amended 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In the light most favorable to the State, the record reflects that the Defendant, the victim's former coworker and friend, came to the victim's home and asked the victim whether he was alone. Without a prior disagreement or provocation, the Defendant drew a gun while the victim's back was turned and pointed it at the victim. The victim raised his hands and told the Defendant, "[It] ain't worth it." The Defendant ordered the victim to go to the bathroom and shot the victim once when the victim did not comply with the order. A rational jury could have found beyond a reasonable doubt that the Defendant acted with an awareness that his conduct was reasonably certain to cause the victim's death. The Defendant's shooting the victim was a substantial step toward killing the victim, and the Defendant's firing a gun was an intentional act. The jury rejected the Defendant's argument that he did not intend to kill the victim because he fled after inflicting a non-fatal gunshot wound. No evidence suggested the Defendant knew the wound was not fatal, and the Defendant did not attempt to render aid to the victim after shooting him. We note that intent to kill may be shown by the use of a deadly weapon on an unarmed victim, a lack of provocation by the victim, and the Defendant's failure to render aid to the victim. *See State v. Trusty*, 326 S.W.3d 582, 595-96 (Tenn. Crim. App.

2010) (concluding that factors weighing toward premeditation "include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim . . . the defendant's failure to render aid to the victim") (citing *State v. Thacker,* 164 S.W.3d 208, 222 (Tenn. 2005)); *State v. Leach,* 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Lewis,* 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted)). We also note that the Defendant's leaving the scene of a shooting and hiding in his mother's attic are circumstantial evidence of guilt. S*ee State v. Zagorski,* 701 S.W.2d 808, 813 (Tenn. 1985) ("flight and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt"); *see also Dorantes*, 331 S.W.3d at 388. The Defendant is not entitled to relief on this basis.

## II

### Aggravated Assault

Aggravated assault, in relevant part, is a knowing or intentional assault in which a person uses or displays a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii). An assault, in relevant part, occurs when a person intentionally or knowingly causes bodily injury to another. *Id*. § 39-13-101(a)(1) (2010) (amended 2013).

In the light most favorable to the State, the record reflects that the Defendant used a gun to shoot the victim. A bullet fragment was recovered from the victim at the hospital. Although the police did not recover a gun, the jury's verdict reflects it credited the victim's testimony that the Defendant shot him. A rational jury could have found beyond a reasonable doubt that the Defendant intentionally or knowingly used a gun to cause bodily injury to the victim. The Defendant is not entitled to relief on this basis.

## III

### Employing a Firearm during the Commission of a Dangerous Felony

Tennessee Code Annotated section 39-17-1324(b)(1) proscribes employing a firearm during the commission of a dangerous felony. Attempted second degree murder is an enumerated dangerous felony. *See id*. § 39-17-1324(i)(1)(B).

As stated above, the evidence is sufficient to demonstrate the Defendant shot the victim using a gun. The jury, by its verdict, credited the victim's testimony that the Defendant shot him while attempting to kill him. A rational jury could have found beyond a reasonable doubt that the Defendant employed a gun during the attempt to commit second degree murder. The Defendant is not entitled to relief on this basis.

# IV

## Possession of a Firearm by a Convicted Felon

Tennessee Code Annotated section 39-17-1307(b)(1) prohibits a person convicted of certain felonies from possessing a firearm. In this case, the parties stipulated that the Defendant had been convicted of two felonies, one involving the use of violence and the other a drug offense. In the motion for a new trial, trial counsel argued that the evidence was insufficient to establish the Defendant possessed a gun because no gun was recovered by the police. The record reflects, though, that the victim saw the Defendant holding a gun before shooting the victim. We conclude that the evidence is sufficient for a rational jury to have found beyond a reasonable doubt the Defendant was a convicted felon and that he possessed a gun. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE